### Appeal of TEXARKANA COTTON OIL CO., INC.        Docket No. 1888.

1. The entire cost of expenditures for improvements upon leased buildings, made by taxpayer as a condition precedent to procuring at nonprohibitive rates insurance upon such buildings necessary to the continued operation of its business, may not be deducted from gross income for the fiscal year in which they were made and paid for, but should be distributed over the remainder of the term of the lease.

2. Such expenditures, not being required by the terms of the lease, are not in any sense rent, the nonpayment of which would terminate the lease before the expiration of the term fixed therein.

Submitted April 16, 1925; decided May 20, 1925.

*Elisha Hanson* and *Eliot C. Lovett, Esqs.*, for the taxpayer.

*Benjamin H. Saunders, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, and TRUSSELL.

This is an appeal from a determination of a deficiency in income and profits tax for the fiscal period ended July 31, 1919, in the amount of $16,684.91. From a stipulation filed, the Board makes the following

FINDINGS OF FACT.

The taxpayer is a corporation organized under the laws of Louisiana, with principal offices at Texarkana, Arkansas.

The taxpayer is now, and has been for many years, engaged in the operation of a cottonseed oil mill, during which time its buildings have been located on ground owned by the St. Louis, Iron Mountain & Southern Railway Company. The lease under which it was operated during 1919 was dated July 1, 1910, and expired on June 30, 1920. The lease contained no provision for its renewal. During the fiscal years 1917 and 1918, the taxpayer was very successful in its business operations as reflected in its Federal taxes, $47,770.99 being paid in 1917, and $44,055.39 in 1918. The profits for 1918 were $84,494. The profits for 1919, including the cost of the changes hereinafter set forth, were more than $56,000. The

taxpayer operated on a fiscal year basis, the fiscal year ending on July 31st.

In the latter part of its fiscal year 1918 the taxpayer was notified that, unless certain changes were made in its seed and hull house, the rate of insurance would be increased from $1.63 to $6.58 on the hundred, and that even at the higher rate probably not more than 50 per cent of the required insurance could be obtained, the insurance companies being willing to write only a small proportion of the needed insurance because of the heavy risk. The increase in rates was occasioned by the enormous losses of the insurance companies during the season of 1918–19 in the cotton oil industry.

The increased insurance rate was so great that payment thereof would have made the continuance of the taxpayer's business impossible, for, without the insurance, the taxpayer could not secure necessary loans from the banks to carry on its business. It was therefore forced to decide whether to make the changes required by the insurance companies to obtain the lower rates, or to discontinue business. In view of the possibility of continued large profits during the remaining period of the lease, the taxpayer decided to make the changes.

The value of the seed and hull house during the year 1917 was set up on the books of the taxpayer as $7,512.26, which valuation was made by the revenue agent. Depreciation for the fiscal years 1917, 1918, and 1919, was allowed at 5 per cent per annum, making a total of $1,690.26. Therefore, at the time the changes were made, the depreciated value of the seed and hull house was $5,822.

The required changes included the building of fire walls and the decreasing of storage compartments for seed to areas of 10,000 square feet. Briefly, this involved moving the north wall of the seed house back 13 feet to provide a wagon way made necessary; rebuilding the wall; erecting two brick fire walls; removing the hull house which was above the seed house; and placing the roof over the seed house.

The contract for making these changes was entered into on May 1, 1919, and the work was completed on July 19, 1919. The total cost was $24,089.88, and final payment was made on July 23, 1919.

As a result of these changes, the taxpayer lost storage space which would have accommodated approximately 500 tons of hulls and 900 tons of cottonseed. Furthermore, in order to load hulls by gravity in their new location, a ten horsepower electric motor had to be installed to elevate the said hulls. They are now carried a distance of about 350 feet to the storage space, whereas before the changes, when the hull house was above the seed house, they were carried only about 75 feet. And now that a fire wall has been built through the center of the seed house, in which wall there is only one opening and that kept closed by a fire door, it is necessary, in loading meal, seed, and sacked hulls, to truck them 100 feet to the opening in the fire wall, and 160 feet back to the track where the cars are located, whereas, prior to the construction of the fire wall the total trucking distance averaged not more than 100 feet.

The taxpayer treated these changes as repairs and deducted the cost thereof from the gross income for the fiscal year 1919.

The deficiency should be computed in accordance with the following opinion. Final decision will be settled on consent or on ten days' notice, in accordance with Rule 50.

OPINION.

JAMES: The taxpayer contends that it should be allowed to deduct the entire cost of the improvements set forth in the findings of fact in and for the fiscal year 1919. It alleges that the entire benefit of such changes related to that year, and that due to the imminence of the termination of its lease its payments were either in the nature of insurance or of rent and could not be regarded as capital expenditures.

The contract for the improvements or changes in the property was entered into on May 1, 1919; the work was completed on July 19, 1919; the fiscal year of the taxpayer closed July 31, and its lease terminated on June 30, 1920.

Accepting the view of the taxpayer that the payments for the changes in the property were at most rental or insurance, it is apparent that the benefits of such rental or insurance carried at least to the date of termination of the lease. If the payments be regarded as payments for insurance, they manifestly had the result of lowering payments of premiums of insurance not alone for the fiscal year 1919 but including the year 1920 to the termination of its lease as well. It does not appear that the expenditures were required to be made in conformity with provisions of its lease or to the demands of its lessor. The payments can not, therefore, be regarded in any sense as rent or as payments, which, had they not been made, would have resulted in the termination of the lease prior to the date of its expiration.

It appears, however, that the expenditures had a definite relation to the continuance of the business of the taxpayer from the time it determined to make them to the end of its lease. It appears that it definitely committed itself to the expenditures in question on May 1, 1919. It is, therefore, the opinion of the Board that the expenditure of $24,089.88 should be distributed over the period from May 1, 1919, to June 30, 1920.